762 So.2d 747 (2000)
STATE of Louisiana
v.
Jermaine HENDERSON.
No. 99 KA 1945.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
*750 Hon. Doug Moreau, District Attorney, Creighton B. Abadie and Dana Cummings, Assistant District Attorneys, Baton Rouge, Counsel for Plaintiff/Appellee State of Louisiana.
Kathy Flynn Simino, Baton Rouge, Counsel for Defendant/Appellant Jermaine Henderson.
Before: SHORTESS, C.J., PARRO, and KUHN, JJ.
KUHN, J.
The defendant, Jermaine Henderson, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. Following a jury trial, he was found guilty as charged. He moved for post-verdict judgment of acquittal and new trial, but the motions were denied. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. He moved for reconsideration of sentence, but the motion was denied. He now appeals, designating five assignments of error.

SUFFICIENCY
In assignment of error number 3, the defendant contends the trial court erred in denying his motion for post-verdict judgment of acquittal. He argues the State failed to prove he intended to kill Eric Johnson. He further claims his actions against Johnson were in self-defense.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. State v. Wright, 98-0601, pp. 2-3 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486-87, writ denied, 99-0902 (La.10/29/99), 748 So.2d 1157.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 98-0601 at p. 3, 730 So.2d at 487.
The crime of second degree murder, in pertinent part, "is the killing of a human being: (1)[w]hen the offender has a specific intent to kill or to inflict great bodily harm...." La. R.S. 14:30.1(A)(1). The purpose of the statute is to prevent the intentional killing of human beings. The statute accomplishes this purpose without requiring the State to prove that the defendant specifically intended the death of the person who was actually killed. See State v. Johnson, 29,629, p. 10 (La.App.2d Cir.8/20/97), 698 So.2d 1051, 1056.
The doctrine of transferred intent provides that when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim. State v. Norfleet, 96-2122, *751 p. 4 (La.App. 4th Cir.10/21/98), 721 So.2d 506, 509; State v. Jasper, 28,187 (La.App.2d Cir.6/26/96), 677 So.2d 553, 566-567, writ denied, 96-1897 (La.2/21/97), 688 So.2d 521.
Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625, p. 4 (La.App. 1st Cir.5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La.12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Seals, 95-0305, p. 6 (La.11/25/96), 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
When a defendant charged with a homicide claims self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in selfdefense. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
La. R.S. 14:20, in pertinent part, provides:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
However, La. R.S. 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
The relevant inquiry on appeal is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. Rosiere, 488 So.2d at 968-69; see also State v. Wilson, 613 So.2d 234, 238 (La.App. 1st Cir.1992), writ denied, 93-0533 (La.3/25/94), 635 So.2d 238.
The evidence at trial was as follows. On October 17, 1997, at approximately noon, the defendant was getting a haircut in J & J Barbershop. He had placed his jacket on the back of the last chair (chair # 5). There were 10-15 customers in the barbershop, including at least two children. The barbers working that day were Willie Nehmia Johnson, III (Nehmia), Jermaine Marlin Anderson (Anderson), Quinton Johnson (Quinton), and the victim, Gary Cavalier. Quinton was cutting the defendant's hair in chair # 2.
As Eric Johnson (Eric) drove up to the barbershop in his vehicle, Cavalier stated, "Jermaine, there go your boy," and the defendant "racked" his gun. Quinton told the defendant that children were present, and he should not "get himself frustrated[.]" Eric walked into the barbershop, exchanged stares with the defendant, and seated himself in the last chair. Eric said he, "ought to go down there and do this to [the defendant][,]" but stopped staring at the defendant and turned his head from the defendant's direction after Nehmia told him to turn his head and calm down.
After the defendant finished getting his haircut, he walked to the chair in which Eric was seated and stated, "Let me get my jacket." The gray handle of the defendant's pistol was sticking out of his pocket. Eric stood up, and the defendant exchanged words with him. Nehmia testified the defendant asked, "Why you did *752 that?" Anderson testified the defendant stated, "So you want to burn my car up." Quinton testified the defendant asked, "Why did y'all do that?" The defendant's hand was on the pistol in his pocket. The men started arguing "like it was going to be a fist fight," and Nehmia, Anderson, and Quinton tried to break up the men. Anderson asked the defendant to "please leave" approximately fifteen times, and Quinton pulled Eric's right arm asking him to leave also. Quinton and Nehmia testified the defendant drew his pistol from his pocket and immediately fired on Eric. Neither Nehmia nor Anderson saw Eric "pull a weapon" and neither man saw a weapon on Eric. Nehmia saw a telephone in a black and gray case on Eric's side. Quinton also did not see Eric draw a weapon, but "thought for sure he had one." When asked to explain why he thought Eric had a gun, Quinton stated, "Cause I seen something black on his side, but they saypeople say it was a phone on his side." Nehmia testified that the defendant and Eric began fighting for the weapon and the weapon was fired again. Following the second shot, the victim used foul language, crawled out of the barbershop, and collapsed by a coke machine. The defendant's father entered the barbershop and disarmed the defendant. The defendant's hand remained on his pistol from the time he drew the weapon until his father took it away from him.
Eric suffered a gunshot to his right arm. The victim suffered a gunshot to his back which perforated his vena cava. He died eight days later from kidney, lung, and liver failure stemming from the gunshot. A bullet was recovered from the victim's body, and a bullet was also recovered from the north wall of the mini-mall adjacent to the barbershop. Both bullets had been fired from the defendant's gun.
Anderson testified that he picked up a gun from the barbershop floor prior to running out of the shop following the gunfire. However, a thorough search by police of the barbershop, Eric's person, and his vehicle, failed to discover a second weapon.
Eric testified at trial. He had frequented the barbershop since it opened and went there on the day of the incident to get a haircut. He conceded that after entering the barbershop, he and the defendant stared at each other. He sat in the last chair because "somebody" told him to sit there. He realized a jacket was in the chair, but did not realize that the jacket belonged to the defendant. Another customer in the shop informed him, using sign language, that the defendant had a gun and Eric became nervous.
Eric gave the following account of the events that followed. After the defendant finished getting his haircut, the defendant walked over to Eric and asked Eric "to let him get his jacket." Eric stood up to let the defendant get his jacket. The defendant picked up his jacket and asked Eric if he had "burn (sic) up the car." Eric answered that he "ain't have nothing (sic) to do with it." The barbers tried to keep Eric and the defendant apart as they argued. Then "the gun came up." Eric explained that the defendant drew his pistol and fired on him. Eric got out of the way "some kind of a way," but the bullet still hit him in the right arm. Eric wrestled with the defendant for the gun trying to stop the defendant from pointing it at him, but never got the gun out of the defendant's hands. The defendant fired again, this time hitting a mirror on the wall. The defendant's father ultimately entered the shop and took the gun away from the defendant.
Eric denied being armed with a gun or any other weapon on the day of the incident, but stated he did have a telephone and beeper. Two police officers testified that a beeper and cell phone were found on Eric's person.
Eric also testified that a week or two prior to the incident, one of his friends, Jessie, had had a fist fight with the defendant over the defendant's baby's mother at *753 Club Dreams, but he (Eric) had not been involved. Eric denied threatening the defendant in any way. He also denied having anything to do with the burning of the defendant's car.
The defendant also testified at trial. He conceded he had carried a loaded .45 weapon into the barbershop and cocked it when he saw Eric's car approaching the barbershop. He claimed he was scared of Eric and "didn't know what [Eric] was going to do." He claimed that after fighting with Eric's friend, Nunie, at Club Dreams approximately a week before the incident in the barbershop, Eric and his friend threatened to "get" him, telling him, "You got to ride out. We'll catch you later." The defendant claimed that after he went home following the fight at the club, he was awoken by a loud knock on the door. He claimed he was scared to answer the door because he thought it was Eric, Nunie, and their friends. After the defendant's father answered the door, the defendant learned that his car was on fire. He suspected Eric, Nunie, and their friends of burning the car, but conceded he was not positive they were responsible.
Following the incident with his car, the defendant claimed he became aware of threats "on the street" that Eric, Nunie, and their friends were going to "get [him]" or "take care of" him. The defendant responded by purchasing a gun "to protect" himself. The defendant claimed he had no intention of doing anything to Eric in the barbershop and placed the gun in his pocket after Quinton told him to be "cool."
After he finished getting his haircut, the defendant went to get his jacket from the chair in which Eric was seated. Eric stood up in response to the defendant's request to let the defendant get his jacket. The defendant then asked Eric, "Why you burn my car up[?,]" and Eric told the defendant he did not know what the defendant was talking about. The men started arguing, and the barbers tried to break up the argument. The defendant claimed that during the argument, Eric saw the defendant's gun in his pocket, said, "Oh, that's how you want to play it," and "reached for his (Eric's) gun on his waist side." At trial, the defendant expressed no doubt that Eric had reached for a gun, claiming he saw Eric lift up his shirt, saw a gun on Eric's person, and saw a gun in Eric's hand. The defendant claimed he pulled out his own weapon in response to Eric's actions because he (the defendant) was scared and "thought [he] was fixing to get shot." The defendant claimed that as he pulled out his weapon, "it went off." He claimed Eric then lunged at him, began fighting with him for the weapon, wrestled with him, and another shot went off as he and Eric fell to the floor. The defendant claimed that he did not have control of the weapon. The defendant conceded he had his hand in his pocket with the gun, but claimed only to have been covering the weapon so no one would see it. He denied intending to shoot Eric when he went to get his jacket.
The defendant's testimony at trial that Eric was armed and that the defendant's weapon merely went off twice was contradicted by State evidence.
The State played the defendant's taped statement given to police on the afternoon following the incident at the barbershop. Therein, the defendant also claimed Eric "reached for a gun." Immediately after making the claim in his taped statement however, the defendant expressed his doubts that Eric had in fact reached for a gun, stating, "I swear I thought it was a gun. I swear I thought I don't know if it was a gun because you all say you ain't find it. I don't know what it was."
The State also presented testimony from Charles Riley Watson, Jr., Louisiana State Police forensic scientist. Watson testified that the defendant's weapon, a Ruger P 90.45 automatic with a seven shot magazine, had a "stiff" trigger which had to be pressed almost an inch in order to fire the weapon.
*754 Additionally, Baker City Police Officer Audi Miller, who took custody of the defendant's weapon from the defendant's father, testified that the weapon was jammed by a spent casing in its chamber. The weapon's magazine contained five more bullets.
In the instant case, whether or not Eric was reaching for a gun at the time the defendant opened fire was a disputed factual matter for the jury to resolve. The jury voted to convict the defendant of second degree murder. That verdict reflects the jury's rejection of the defendant's testimony and resolution of the disputed factual issue against him. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 99-0385, pp. 9-10 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223.
A rational fact finder, viewing the evidence in the light most favorable to the prosecution, could find that the evidence presented by the State established that the defendant was the aggressor in the conflict and, thus, not entitled to claim self-defense. Further, even if it could be found that defendant was not the aggressor, any rational trier of fact could find, beyond a reasonable doubt, that the defendant did not act in self-defense. Defendant could have left the barber shop without conflict but he chose to confront Eric. His self defense theory was undermined by the evidence establishing that defendant took out a loaded gun, pointed it at Eric, and fired twice. More than one witness testified Eric did not have a gun. The State also presented evidence that during the struggle that ensued between the defendant and Eric for the gun, the defendant had maintained control of the gun prior to the second shot. Thus, it was reasonable for the jury to find that the defendant had the specific intent to kill Eric Johnson or to inflict great bodily harm on him, and that this intent was transferred, through the doctrine of transferred intent, to the victim.
Moreover, when a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls; and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See State v. Lilly, 552 So.2d 1036, 1039 (La.App. 1st Cir.1989). No such hypothesis exists in the instant case. Accordingly, this assignment of error is without merit.

CHALLENGE FOR CAUSE
In assignment of error number 1, the defendant contends the trial court erred in granting the State's challenge for cause of prospective juror Dieaneria Richardson. He argues that because Richardson indicated she could render a guilty verdict if the State proved its case beyond a reasonable doubt, the trial court abused its discretion in granting the State's challenge for cause.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the prospective juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to the law reasonably may be inferred. However, the trial court is vested with broad discretion in ruling on a challenge for cause; its ruling will not be disturbed on appeal absent a showing of an abuse of discretion. State v. Parfait, 96-1814, p. 4 (La.App. 1st Cir.5/9/97), 693 So.2d 1232, 1236, writ denied, 97-1347 (La.10/31/97), 703 So.2d 20. The State or the defendant may challenge a juror for cause on the ground that the juror will not accept the law as given to him by the court. La.Code Crim. P. art. 797(4).
*755 During the voir dire of panel # 2, the State asked prospective juror Dieaneria Richardson if she would require the State to prove a perfect case and if she was comfortable with the concept of reasonable doubt. Richardson answered the questions "No," and "Uh-Huh[,]" respectively. The State then asked Richardson to describe the concept of reasonable doubt and the following exchange occurred between Richardson and the State:
A. Well, given that there is no other reason, you knowin other words, that you should be just totally convinced that this is, you know, what happened. And there should be no doubt in your mind that this is what happened. And that'sto me, that's how you would come to a conclusion that this is, you know, your final decision.
Q. Okay. And my only disagreement with that is that it's okay if you have doubts. You get to have doubts. They just can'tagain, this definitionand I'm sure everybody knows it when they see it. But you can have doubts as long as you cannot assign a rational basis. In other words, you know, if identity is an issueand I'll just sayagain, keep away from the facts. Identity is an issue. And you've had somebody who's identified this person and then the only other reasonable explanation is an identical twin brother but nobody has introduced any evidence that there's an identical twin brother. So you kind ofyou know, for some reason it pops into your mind in the jury box, you know. Just one of those things. You think, well, you know, he could have a twin. He could have an identical twin. That's a doubt that has popped into your mind. But is that reasonable?
A. Well, for me, I would want to know. Because I wouldn't want to convict anybody. And I don't have enough information oryou know, if there's a doubt, you know, I just wouldn't want to have that hanging over me knowing that I could have let that person maybe have a lesser charge. I would have to know.
Q. Okay. And I appreciate that, and I appreciate your honesty. But it sounds like what you're telling me is that you would require more than reasonable doubt. It sounds like you want to be sure.
A. Sure. Exactly.
Q. So, are you telling me that you don't think you could be fair to the state in this case because you can't follow the reasonable doubt, it's got to be to a certainty?
A. It has to be a certain degree. Exactly. Because that's someone's life.
Q. I understand.
A. Even though someone's life is gone. You know, that's another life.
Q. I understand. And I do appreciate your honesty. And that's why we do this, is, you know, to find out how you you're thinking and see if you can be fair in this case. So if the judge tells you that the standard is reasonable doubt, even if he tells you, you're still going to require that the State prove it to a certainty?
A. Exactly. Uh-Huh.
Thereafter, the following exchange occurred between the defense and Richardson:
Q. Ms. Richardson, you had indicated that you could not render a decision in this case? Is that what you indicated earlier?
A. Uh-huh.
Q. Now, I notice on your interview sheet: but I do not believe in the death penalty. This isn't a death penalty case.
A. Well, I didn't know that at the time.
Q. So you're telling the court you still cannot render an opinion or
A. Not with the reasonable doubt. No.
Q. Oh, okay. But ifyeah.
A. Yeah, if

*756 Q. If the decision isI mean, if sheif the DA's office proves beyond a reasonable doubt, then you could do it?
A. Well, yeah.
The State challenged Richardson for cause, and the defense claimed that Richardson had been rehabilitated by her answers to defense questioning. The trial court called Richardson to the bench and the following exchange took place:
[Court]: All right. Ms. Richardson, the reason we called you up here is you gave some answers to the questions when Ms. Cummings was asking them concerning whether or not you could be fair to the State. Then when Mr. Messina asked some questions you seemed to give some different answers. And I need to ask you again whether or not you could be fair to the State.
[Richardson]: Okay. All I said was that with a reasonable doubt I could not give a conviction. That's what I said, and that's what I meant. If I said it incorrectly, that's what I meant.
[Court]: All right.
[Richardson]: I would have to know.
[Court]: Have to know.
[Richardson]: I would have to know.
[State]: Would you have to be certain?
[Richardson]: I would have to be certain.
[State]: That's the deal.
[Richardson]: I would have to be certain. I couldn't convict anybody on a life sentence, you know. I just couldn't do it, not knowing, you know, positively that, you know, that was so.
[Court]: All right.
[State]: Are you talking about a hundred percent certainty?
[Richardson]: Yes. Of someone's life. Yes.
[State]: So you're telling us that you can't follow the reasonable doubt theory?
[Richardson]: No.
[State]: Okay. That's
[Defense]: Are you saying you can't follow it orbecause when I asked you
[Richardson]: No. Because it would have to be a hundred percent. I would have to know definitely.
[State]: That's what I thought I understood. And then I got confused when he came back and asked you again.
[Richardson]: Okay. No.
[Court]: Do you have any other questions?
[Defense]: Yeah. What is a hundred percent to you?
[Richardson]: No doubt. I mean, you know, in my mind. You know, just knowing that
[Defense]: So if the State proves every element of the crime, say there's no reasonable doubt whatsoever, you could not return a verdict in favor of the State of guilty as charged? That's what you're telling us?
[Richardson]: If I had no doubt in my mind.
[Defense]: Okay. But, I mean, if the State proved all the elements she talked about, or the State talked about, that you could find guilty as charged?
[Richardson]: Ifyes, if
[State]: To a hundred percent certainty.
[Richardson]: To a hundred percent certainty. I'm sorry.
[Court]: No. That's fine. You just need to answer the questions like you are. Reasonable doubt is a hard thing to define, and you're probably struggling with that.
[Richardson]: The reason being is because I had a brother that was convicted 24 years ago, and he just got out. And, to me, he was wrongly accused. So, like I sayand they hadit was tons of doubt. You know what I'm saying? Soand it was just, you know, like I said, it was back then and it justhe was convicted of this and he served 24 and a half years. So that's why I say I *757 would have to be certain, you know. I just would have to know.
[Court]: Okay. Do y'all have any more
[Defense]: I have none.
[Court]: You can have a seat.
[State]: Thank you.
The State reurged its challenge for cause against Richardson, the defense objected, and the court granted the challenge.
The trial court did not abuse its broad discretion in granting the State's challenge for cause. Richardson's responses as a whole revealed facts from which her inability to render judgment according to the law could reasonably be inferred. Accordingly, this assignment of error is without merit.

JURY INSTRUCTION
In assignment of error number 2, the defendant contends the trial court erred in denying his request to include a special jury instruction on the law of negligent homicide. He argues there was evidence from which the jury could have inferred he was guilty of negligent homicide, and thus, the trial court was obligated to charge the jury on that verdict.
Negligent homicide, La. R.S. 14:32, is not a responsive verdict to a charge of second degree murder. La.Code Crim. P. art. 814(A)(3). The only responsive verdicts which may be rendered when the indictment charges second degree murder are 1) Guilty; 2) Guilty of manslaughter; and 3) Not Guilty. La.Code Crim. P. art. 814(A)(3). The trial court was obligated to charge the jury on these verdicts and did so. Buchanon, 95-0625 at pp. 8-9, 673 So.2d at 667. The court was also obligated to charge the jury as to any theory of defense which the jurors could reasonably infer from the evidence. See La.Code Crim. P. art. 802; Buchanon, 95-0625 at p. 9, 673 So.2d at 667. The offense of negligent homicide was not fairly supported by the evidence, and thus, the defendant's special jury charge regarding the same was not pertinent. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La.Code Crim. P. art. 807; Buchanon, 95-0625, p. 9 at 673 So.2d at 667-68. Accordingly, this assignment of error is without merit.

MOTION FOR NEW TRIAL
In assignment of error number 4, the defendant contends the trial court erred in denying the defense motion for new trial. He argues the verdict was contrary to the law and the evidence, relying upon his argument under assignment of error number 3. Additionally, he argues the trial court erred in denying the defense motion for new trial based on newly discovered evidence.
Prior to sentencing, the defendant moved for a new trial under La.Code Crim. P. art. 851(1) and La.Code Crim. P. art. 851(3). At the hearing on the motion, the defense counsel alleged that thirty to sixty days following the defendant's conviction, he was contacted by an attorney representing the victim's family. The attorney advised the defense counsel that he had filed a civil suit on behalf of the victim's mother, Shelia Denise Cavalier, seeking to recover monetary damages against the defendant for the victim's death. Cavalier's position in the civil suit was that the victim's death was the result of negligent homicide. The defense counsel argued that had he known of the civil suit, he would have called Cavalier at trial and questioned her concerning the civil suit. Additionally, the defense counsel argued the State had refused to consider a guilty plea to a lesser charge claiming the victim's family would not accept a plea to anything less than the offense charged. However, the State responded that it had consulted with the victim's grandmother, Albetine Cavalier, who had raised the victim, in determining whether or not to allow the defendant to plead to a lesser offense.
*758 The State further argued the defense had failed to allege the existence of "new evidence" because Shelia Cavalier was not a witness to the incident in the barbershop and any opinion she might have concerning whether or not the offense was the result of negligence or murder was irrelevant. Additionally, the State argued the civil suit was a matter of public record and could easily have been discovered by the defense.[1] The trial court asked the defense whether it was alleging that Shelia Cavalier had witnessed the crime, and the defense stated it was not. The court denied the motion for new trial, and the defense objected to the court's ruling.
La.Code Crim. P. art. 851, in pertinent part, provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
. . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty ....
In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. State v. Smith, 96-0961, p. 7 (La.App. 1st Cir.6/20/97), 697 So.2d 39, 43. In evaluating whether or not the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. The trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Maize, 94-0736, pp. 27-28 (La.App. 1st Cir.5/5/95), 655 So.2d 500, 517, writ denied, 95-1894 (La.12/15/95), 664 So.2d 451.
In support of the motion for new trial based on newly discovered evidence, defense counsel cites State v. Shanks, 97-1885 (La.App. 1st Cir.6/29/98), 715 So.2d 157, and State v. Brooks, 98-1151 (La.App. 1st Cir.4/15/99), 734 So.2d 1232, writ denied, 99-1462 (La.11/12/99), 749 So.2d 651. Shanks involved a second degree murder prosecution of a defendant who on August 14, 1995, shot the victim once with a shotgun as the victim exited the defendant's mobile home. Shanks, 97-1885 at p. 2, 715 So.2d at 158. The victim died on September 4, 1995. Shanks, 97-1885 at p. 2, 715 So.2d at 159. The defendant urged a defense of accidental shooting. Shanks, 97-1885 at p. 3, 715 So.2d at 159. The trial court refused to allow the defense to introduce a civil petition filed on behalf of the victim's children claiming wrongful death damages stemming from alleged negligence by the defendant causing the victim's death and further denied the defense the opportunity to present testimony from the children concerning conversations they may have had with the victim prior to his death. Shanks, 97-1885 at p. 12, 715 *759 So.2d at 163. On appeal, this Court remanded the case back to the trial court for a reopened hearing on the defense motion for new trial with instructions to the trial court to grant a new trial if it determined that the exclusion of the testimony of one or more of the children at trial amounted to such prejudicial error as to require the granting of a new trial. Shanks, 97-1885 at pp. 12-14, 715 So.2d at 163-64.
Brooks involved a second degree murder prosecution[2] of a defendant who shot a victim with a .17 grams percent alcohol level after the victim and another man, Robertson, approached the defendant and a woman outside a dance hall. Brooks, 98-1151 at pp. 2-3, 734 So.2d at 1233. The defendant urged a defense of self-defense and defense of another. Brooks, 98-1151 at p. 3, 734 So.2d at 1233. Prior to trial, the defense moved in limine, seeking a ruling allowing evidence of the victim's abusive behavior (including death threats) toward the defendant. Brooks, 98-1151 at p. 3, 734 So.2d at 1233-34. The trial court denied the motion in limine without reasons and did not allow the defense to proffer testimony. Brooks, 98-1151 at p. 4, 734 So.2d at 1234. On appeal, finding a hiatus in the record concerning whether or not the defendant had knowledge at the time of the offense of an unrelated shooting involving the victim and Robertson, this Court remanded for a pretrial hearing with instructions to the trial court to review and rule on the admissibility of the evidence the defendant had attempted to proffer. Brooks, 98-1151 at pp. 16-18, 734 So.2d at 1240-41.
The defendant's first argument that the verdict was contrary to the law and evidence is without merit for the reasons set forth above in our discussion of assignment of error number 3.
The defendant's second argument that the trial court erred in denying the motion for new trial based on newly discovered evidence is also without merit. In the instant case, there was no clear abuse of discretion by the trial court in denying the defense motion for new trial under La.Code Crim. P. art. 851(3). Even assuming, arguendo, that the defense showed that it discovered the existence of the civil suit (the evidence) after trial, it did not show that its failure to discover the evidence at the time of trial was not caused by lack of diligence,[3] did not show that the evidence was material to the issues at trial, and did not show that the evidence was of such a nature that it would probably have produced a different verdict.
The authorities relied upon by the defendant are distinguishable. This Court's action in Shanks was dictated by the strong likelihood that the victim told his children something helpful to the defense's accidental shooting theory prior to his death. In Brooks, the defendant's knowledge of the victim's involvement in an unrelated shooting, if established, would have provided a basis for the introduction of evidence helpful to the defense of self-defense and defense of another. In the instant case, however, the defendant urged the theory of self-defense against Eric, not the victim, and the trial court did not restrict the defendant's presentation of his alleged reasons for fearing Eric. Also, the evidence which defendant sought to introduce in a new trial is not clearly material to the defense of self-defense. Accordingly, this assignment of error is without merit.

EXCESSIVE SENTENCE
In assignment of error number 5, the defendant contends the trial court *760 erred in imposing an excessive sentence and erred in failing to consider a downward departure from the mandatory minimum sentence provided by La. R.S. 14:30.1. He argues that because he was only twenty-one years old at sentencing and had no prior felony convictions, imposition of the sentence mandated by La. R.S. 14:30.1(B), i.e., mandatory life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, was unconstitutionally excessive and should have been reduced under the principles set forth in State v. Dorthey, 623 So.2d 1276 (La.1993).[4]
In Dorthey, 623 So.2d at 1280-81, quoting State v. Lobato, 603 So.2d 739, 751 (La.1992), the Louisiana Supreme Court recognized that if a trial judge determines that the punishment mandated by the Habitual Offender Law makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," he is duty bound to reduce the sentence to one that would not be constitutionally excessive.
However, the holding in Dorthey was made only after, and in light of, express recognition by the court that, "the determination and definition of acts which are punishable as crimes is purely a legislative function. It is the Legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies. Moreover, courts are charged with applying these punishments unless they are found to be unconstitutional." Dorthey, 623 So.2d at 1278. (Citations omitted).[5]
In State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, the Louisiana Supreme Court reexamined the issue of when Dorthey permits a downward departure from the mandatory minimum sentences in the Habitual Offender Law. The court held that to rebut the presumption that the mandatory minimum sentence was constitutional, the defendant had to "clearly and convincingly" show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

Johnson, 97-1906 at p. 8, 709 So.2d at 676, quoting State v. Young, 94-1636, pp. 5-6, 663 So.2d 525, 528 (Plotkin, J., concurring.).
In the instant case, the defendant's age of twenty-one years was duly considered at sentencing by the trial court. The trial court also recognized that the defendant was technically a first offender. However, the pre-sentence investigation report ordered and reviewed by the court also revealed: that as a juvenile the defendant *761 had been adjudicated a principal to first degree robbery (on a charge of armed robbery); that approximately a year-and-a-half prior to the instant offense, the defendant pled guilty to simple battery (following his arrest for second degree battery), and that while out on bond awaiting trial on the instant offense, the defendant was arrested for armed robbery and possession with intent to distribute marijuana.
In committing the instant offense, the defendant acted with deliberation in "racking" his weapon, approaching Eric, and drawing and firing his weapon. The defendant had ample opportunity to leave the barbershop when Eric arrived, but chose instead to force a confrontation. The instant offense caused the loss of one man's life, a gunshot wound to another man, and endangered the lives of the 10-15 customers, including at least two children, in the crowded barbershop. Further, had the defendant's weapon not fortuitously jammed after the firing of the second of the seven bullets it contained, further loss of life could easily have resulted.
The defendant failed to clearly and convincingly show that because of unusual circumstances he was a victim of the legislature's failure to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. Accordingly, there was no reason for the trial court to deviate from the mandatory sentence provided for the instant offense by La. R.S. 14:30.1(B). This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The record does not contain the civil suit, and the date the suit was filed was not discussed at the hearing on the motion for new trial. However, the victim died on October 25, 1997, and thus, a timely action for damages based upon the defendant's negligence in connection with the death would have to have been filed on or before October 26, 1998. See La. Civ.Code arts. 3454, 3492. The defendant's trial was held between November 30, 1998 and December 3, 1998.
[2] The defendant was convicted of manslaughter. Brooks, 98-1151 at p. 2, 734 So.2d at 1233.
[3] A motion for a new trial is properly rejected when it is based on evidence which should have, with reasonable diligence, been discovered before or during the trial. State v. Clark, 558 So.2d 665, 669 (La.App. 1st Cir.), writ denied, 564 So.2d 317 (La.1990).
[4] In its brief to this Court, the State alleges the defendant filed a motion to reconsider sentence arguing the sentence he received was excessive due to his young age, that the age of the defendant was known at the time of sentencing, and therefore, the defendant should be precluded from raising any claim other than a bare claim of constitutional excessiveness. A thorough review of the record, however, reveals that following its notice to the trial court at sentencing of its intention to appeal the sentence, the defense timely moved for reconsideration of sentence arguing, in pertinent part, that defendant received the maximum sentence allowed by law which is excessive being that defendant is a first felony offender, and that the sentence is excessive due to the nature of the crime. Defendant requested that his sentence be reconsidered in light of the circumstances surrounding this matter and these mitigating factors. Accordingly, the defendant's argument is properly before this Court.
[5] The sentencing review principles espoused in Dorthey were not restricted in application to the mandatory minimum penalties provided by La. R.S. 15:529.1. See State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274, 1275; State v. Davis, 94-2332, pp. 11-12 (La.App. 1st Cir.12/15/95), 666 So.2d 400, 407-08, writ denied, 96-0127 (La.4/19/96), 671 So.2d 925.