STATE OF LOUISIANA
v.
CHRISTOPHER SHANE McKEMIE
No. 2008 KA 2093.
Court of Appeals of Louisiana, First Circuit.
September 11, 2009.
Not Designated for Publication
HON. JOSEPH WAITZ, DISTRICT ATTORNEY, HERBERT BARNES, ELLEN DAIGLE DOSKEY, ASSISTANT DISTRICT ATTORNEYS ATTORNEYS FOR STATE OF LOUISIANA
BERTHA M. HILLMAN ATTORNEY FOR DEFENDANT-APPELLANT CHRISTOPHER SHANE McKEMIE
Before: CARTER, C.J., GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
The defendant, Christopher Shane McKemie, was charged by grand jury indictment with aggravated rape, a violation of La. R.S. 14:42. The defendant entered a plea of not guilty. After a trial by jury, the defendant was found guilty as charged. The defendant filed a motion for new trial and a motion for "judgment notwithstanding the verdict." The trial court denied the motion for new trial. The trial court treated the defendant's motion for judgment notwithstanding the verdict as a motion for post verdict judgment of acquittal, acquitted the defendant of the aggravated rape conviction, and reduced the conviction to sexual battery, a violation of La. R.S. 14:43.1. Prior to sentencing, the State filed an application for supervisory writs with this court alleging that the trial court erred in granting the defendant's motion for post verdict judgment of acquittal. This court issued the following writ action:
WRIT GRANTED. The trial court's ruling on defendant's motion requesting a post verdict judgment of acquittal on the aggravated rape conviction is reversed, and the aggravated rape conviction is reinstated. The scope of review of questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and does not extend to credibility determinations made by the trier of fact. See State v. Meredith, 536 So.2d 555, 557 (La. App. 1st Cir. 1988), writ denied, 544 So.2d 396 (La. 1989), La. Const, art. V, § 10(B).
State v. McKemie, XXXX-XXXX (La. App. 1 Cir. 9/7/07) (unpublished). On remand, the defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error as to the sufficiency of the evidence and the trial court's denial of the supplemental motion for a new trial based on jury misconduct. For the reasons that follow, we affirm the conviction and sentence.

FACTS
In December 1998, the defendant began cohabitating with Kristy Rougeau. Rougeau had a daughter from a previous relationship, M.M. (the victim), who was about four years of age at the time.[1] The couple were married and later divorced in September 2002. According to the victim, while living with the defendant, he began touching her private part on occasion. The victim further stated the defendant put his "private" or "thing" inside of her "private," "choonie," or "coochie" on several occasions. The victim was unsure regarding the specific dates or of her age at the time of the incidents. During a party for her eighth birthday (after the defendant and Rougeau were separated), the victim first divulged incidents to her mother and a friend of the family, Dawn Chancey.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant notes the credibility of the victim is not at issue, adding that the trial judge stated on the record he believed the victim was being truthful. However, the defendant argues the victim's testimony was unreliable. The defendant contends medical testimony indicated the victim was delusional. The defendant notes the victim was unable to give any details of the alleged sexual act. The defendant lists the following specific examples: the victim could not remember if the defendant took off his clothes; she could not remember if the defendant moved during a sexual act; she was not sure if the defendant's penis was hard or soft; she was unable to describe the defendant's penis; she indicated she was unable to see the defendant's penis; and she did not know if her eyes were open or shut. According to the defendant, the lack of detail in the victim's testimony indicates that, although she was not lying, she did not truly understand what or if anything had happened. Thus, the defendant argues the evidence was insufficient to establish that he committed any crime. In the alternative, the defendant argues the trial court was correct in finding there was insufficient evidence to support the crime of aggravated rape and that the defendant could only be found guilty of the responsive offense of sexual battery.[2]
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and adopted by the Legislature in enacting La. Code Crim. P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence. La. R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. Graham, XXXX-XXXX, p. 5 (La. App. 1 Cir. 2/14/03), 845 So.2d 416, 420. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984).
To support a conviction of aggravated rape, the State was required to prove beyond a reasonable doubt that defendant had vaginal or anal sexual intercourse with a victim who was under twelve years of age. La. R.S. 14:42A(4).[3] "[A]ny sexual penetration, vaginal or anal, however slight is sufficient to complete the crime." La. R.S. 14:41B (as stated before the amendment by 2001 La. Acts No. 301, § 1).
Detective Corey Douglas Johnson of the Houma Police Department testified that on January 14, 2004, Kristy Rougeau, the victim's mother, came to the police department, accompanied by her friend. Dawn Chancey, and M.M., who was ten years old at the time. As a result of Rougeau's complaint against her ex-husband, the defendant, Detective Johnson began an investigation. The detective spoke with Rougeau, Chancey, the victim, and the defendant. Rougeau provided Detective Johnson with a letter from Dr. Robert Alexander, the victim's urologist. Detective Johnson made arrangements for the victim to be interviewed at the Child Advocacy Center and examined at Children's Hospital in New Orleans. The next day, the defendant was interviewed and then arrested and charged with aggravated rape. According to Detective Johnson, the defendant advised he did not do anything. Detective Johnson testified that the defendant admitted he slept in the nude sometimes, even when the child slept in the bed with him and his wife. The detective stated he asked the defendant whether he found that to be inappropriate, and the defendant did not respond.
A videotape of M.M.'s statement of January 14, 2004, was admitted in evidence at trial. M.M. stated the defendant would pick her up from Mulberry Elementary after school, take her home to his parents' house on Sunset Boulevard, undress her, and "put me on top of him and stick his thing in my choochie, that's my private." She also stated the defendant touched her "private." When asked if she knew where her private parts are, she pointed to her chest, genital area, and backside. The victim confirmed she would tell the defendant to stop, but he would not. She stated the incidents occurred when her mother was at work when they lived in the house on Sunset Boulevard with the defendant's parents. She stated his parents were in the other room and did not know. She stated she was eight years old and in first grade at the time. When asked what she noticed about the defendant's "private," she stated she did not look at it. When asked if she noticed anything about her "private" after these occurrences, she stated her "pee would burn." When asked whether the defendant would move around or remain still when on top of her, the child stated she did not remember. Later, when asked whether the incidents occurred when they lived in other houses, she stated they occurred at a white house as well, when she was in second grade.
Rougeau testified that she and the defendant moved in together in December 1998, were eventually married, and were divorced in September 2002. During the marriage they had a son. They moved several times during the marriage. Rougeau and the defendant divorced because of distrust, money issues, and emotional abuse. At the time of the separation, she was not aware of any complaints by her daughter against the defendant. During the marriage, there were two incidents, which she now sees as signs of sexual abuse. On the first occasion, she fell asleep in her son's room. She heard M.M. talking in the middle of the night, so she walked across to her own bedroom, where M.M. was in the bed. M.M. said, "Mr. Chris won't let me put my panties on." The child's underpants were off. Rougeau asked the defendant what was going on, and he said, "I don't know. She must have done it in her sleep." The victim was about six years old at the time and sometimes slept in their bed because they could not get her to sleep in her own bedroom. The second incident occurred in the winter of 2001. M.M. was again sleeping in bed with her mother and stepfather. She was wearing one-piece pajamas. Rougeau heard her daughter making noises, rolled over, and noticed that her pajamas were unzipped all the way down in front. Rougeau zipped the pajamas up and placed the child on the other side of her, away from the defendant. Approximately, two months later, in January 2002, she and the defendant were separated.
Ten months later, in November 2002, at M.M.'s eighth birthday party, the child, for the first time, mentioned something to her mother about the alleged sexual abuse. M.M. said that whenever she would get home from school, the defendant would make her lie with him, after she took off her school uniform, before changing her attire to her play clothes. Rougeau was at work, and the defendant was not employed. Rougeau testified that she did not ask her child any more about it at the party. She ultimately asked the victim if the defendant touched her, and she responded negatively.
Rougeau testified that although M.M. had always been a sweet, well-behaved child, she started to change in October 2003. She became defiant, began having problems at school, started having nightmares, and did not want to sleep by herself. At one point, she began to hear voices in the school bathroom. At this time, M.M. expressed a desire to live with her biological father. Additionally, she had an incident at school where she was seeing and hearing things that were not there. Rougeau contacted a social worker, Janet Buescher, and told her about the behavioral problems. The counselor said the victim might be trying to pit her mother and father against each other. One week after this incident at school, the victim again told her mother about the alleged abuse by her stepfather. She had just been dropped off at home by her father, and she was totally uncontrollable. She was screaming, and Rougeau had to hold her down to keep her from running out of the house. Rougeau took her to Terrebonne General Hospital to talk to a doctor and to get her calmed down. The victim did not attend school the next day. Dawn Chancey came over, and the victim told her mother and Chancey, "Mr. Chris touched ... [m]y privates." When Rougeau asked her whether the defendant put anything inside her, the victim said, "his thing." The victim was in counseling at this time with Janet Buescher. Rougeau took the victim to the police department. She subsequently took her to Dr. Alexander, a urologist, for an examination and to Children's Hospital for a forensic examination.
Within a month after the disclosure, the victim became very scared. She was having hallucinations, seeing things, and hearing things. One night, she was seeing people outside the windows and hearing people on the roof. She stayed up all night. The next morning Janet Buescher referred her to River Oaks Hospital in New Orleans, where she was admitted and remained a patient for five days. Dr. Lincoln Paine, a psychiatrist, treated the victim at River Oaks Hospital. The hallucinations stopped, although, according to Rougeau, she "still does have some problems."
Rougeau further testified that the defendant had recently been allowed supervised visits with their son. After M.M. asked to live with her biological father in October 2003, she did so for approximately four weeks. She switched schools to Montegut Elementary at that time. The victim told her mother she desired to live at her father's house because she was afraid of the defendant. She felt safe at her father's house. Rougeau admitted her daughter can be manipulative when she wants something. She admitted the victim does pit her parents against each other. She also admitted that during her marriage with the defendant, the victim heard arguments between them and heard her say disparaging things about the defendant. Rougeau acknowledged her daughter is a very emotional child who strongly overreacts to things. She further stated that since the defendant's arrest, M.M.'s unruliness, nightmares, and hallucinations have not completely subsided. She now earns Ds and Fs in school although she was once on the A-B honor role. Rougeau testified that she had never spoken in detail with her daughter about the sexual abuse.
Mary Pontiff Aucoin, the principal at Mulberry Elementary School, testified that M.M. seemed extremely frightened on several occasions at school. On December 2, 2004, M.M. came to the office looking extremely scared and shivering. M.M. told the principal her stepfather was at school for parent luncheon day, visiting his son from a different marriage who was M.M.'s age. On another occasion, M.M. said she saw the defendant outside the window. The principal testified she did not know whether it was true, but M.M. appeared frightened. The principal stated she at no time saw the defendant at school, but would not have been surprised if he was there on parent luncheon day. She stated M.M. "would almost be shaking. She would cry. She was just an emotional wreck." She testified M.M. previously made good grades, was a good child, and never appeared scared for any other reason. The principal stated M.M. "was not a child who had phobias or anything like that."
Dawn Chancey, a friend of the victim and Rougeau, testified she was present the first time M.M. disclosed she had been molested by the defendant. Chancey was at M.M.'s house for the birthday party in November 2002. She testified that the victim stated the defendant had "done something to her as far as touched her in spots she was uncomfortable with." M.M. did not give any specific details. Weeks later, the second disclosure to Chancey occurred. M.M. stated defendant "touched her private area and ... that he put his penis in her vagina." Chancey acknowledged the child used the correct anatomical words only after Chancey asked her questions to clarify what she meant. She testified that the victim initially called the defendant's penis "his thing." The victim stated it happened "several" or "many" times. Chancey further testified that M.M. disclosed that the defendant would "sit there and make her take off her clothes." Chancey testified that M.M. told her that she was afraid that if she told anyone, the defendant would do something to her or to her brother. Chancey testified that M.M.'s behavior began to change for the worse a short time after she made the disclosures.
The victim testified that she was born on November 3, 1994. She testified that she knew the difference between the truth and a lie. When asked whether the defendant ever touched her in an inappropriate way, she responded positively. When asked about her first recollection, she stated that he took off her clothes and that it usually happened during the day, while she changed from school to play clothes and also at other times. She stated it first occurred on Goode Street. The victim could not remember how old she was at the time. She further testified, "He touched me with his hand on my private." She stated her name for her private was "choonie." She stated the next incident was in her mother's room at night when the defendant took off her shirt, shorts, and panties. She stated her mom was at work. She stated the defendant opened her legs and "stuck his private in my private." She stated she was laying facing up on the bed. She asked the defendant to stop, but he did not comply. When asked if he put anything on her private, she stated he put saliva on it. She stated he licked his hand and "then put it on my choonie." She stated this occurred in the white house on Commerce Street in Houma and it occurred plenty of other times, including occasions while they lived on Sunset Street. The defendant told the victim not to tell anyone.
M.M. began hearing voices and seeing people at night when she was trying to go to sleep while she was living on El Paso Street. M.M. talked to Janet Buescher and Dr. Paine about those experiences. According to the victim's testimony, her mother and Chancey were the first persons she told about the defendant touching her inappropriately. She testified that she saw the defendant at the parent luncheon day at school and that she was scared of him and started crying. She further testified that she saw him one more time after that, when she was on her way to camp. She stated the defendant was fixing a building on that occasion. She saw people and heard voices that did not actually exist, saying things like the defendant was going to take her brother (the defendant's biological son) away from her. This was the reason she had to go to the hospital. Since taking medicine, she no longer sees and hears things that are not there. On cross-examination, she admitted she would do almost anything to prevent a situation where her brother would go live with the defendant. She stated she could not remember whether the defendant was wearing clothes at the time of the molestation. When asked whether the defendant moved or remained still while on top of her, she responded she could not remember. When asked if recently the defendant had begun seeing his son again, M.M. responded affirmatively. When asked during re-direct examination whether the defendant's penis seemed hard or soft, she stated she was not sure. She stated she "wouldn't want to look" at the defendant's private part.
Dr. Robert Alexander, qualified by the court as an expert in the field of urology, testified that M.M. had been seen in 1998 when she was about four years old, for burning upon urination and a vaginal discharge. A catherized urine sample was taken, which was essentially clear, and there was no sign of a discharge. The examination was normal with no explanation found for the burning sensation. In August 1999, she was seen again for a complaint of burning and redness in the vaginal area. She was treated at this time for a yeast infection that probably resulted from having taken antibiotics for an upper respiratory infection. She was next seen in October 1999 with a complaint of having burning intermittently for six months. Examinations were done, with an abnormal finding from the bladder but no sign of vaginal inflammation. Again, she had been taking antibiotics and had a urinary-tract infection. The fourth time she was seen, in August 2000, she complained of having burning for one week and of lower abdominal pain. Again, the doctor diagnosed a yeast infection. The last time she saw Dr. Alexander was on January 14, 2004, when her mother was concerned there had been sexual abuse during the time they were living with the defendant. An examination revealed the child's vaginal area appeared normal with no evidence of vaginitis or tearing. Her hymen was intact. While there were no signs of sexual abuse, the examination could not rule out that sexual abuse had occurred since any tearing would have had time to heal.
Dr. Scott Anthony Benton, qualified by the court in the field of pediatric forensic medicine, testified that the victim was examined (by another doctor) when she was admitted to Children's Hospital, where Dr. Benton works. She was nine years old and in third grade at the time. The victim gave a history of sexual abuse. She told the interviewing doctor it first occurred when she was in the first grade and around seven years old and continued throughout her mother's relationship with the defendant. She stated the defendant would undress her, put her on top of him, and put his "thing" in her "coochie." She also stated she would tell the defendant to stop, but he would not. She stated the defendant told her not to tell anyone. She further told the doctor interviewing her that after the sexual encounters, "When I would pee, it would burn." The vaginal examination was normal, with no evidence of acute trauma, injuries, or tears. There was no evidence, such as scarring, of remote injuries and no physical signs of abuse of the child. The hymen was normal with no signs of previous injury. Dr. Benton testified that one would not necessarily expect to see such evidence, however, even if there had been sexual abuse. Dr. Benton stated injury is rarely seen following rape. He stated it is not common to see an injury to the hymen even following penile penetration. He explained that the child's hymen is typical and is crescent shaped, allowing for penile penetration without tearing. He testified that, regardless, vaginal tearing would heal in just two weeks. The doctor concluded that a normal examination neither confirms nor denies previous sexual abuse. Dr. Benton also testified that delayed disclosure of sexual abuse by a child is not uncommon and that most children disclose as a process, adding they, "move backwards a little bit before they eventually move forward."
During cross-examination, Dr. Benton stated they did not expressly question children regarding positioning during a sex act, and that there were no indications that the victim was specifically questioned in that regard. On re-direct examination, Dr. Benton testified that in hindsight, reported symptoms of urinary burning and vaginal inflammation deserved further analysis, adding that trauma is among the fairly limited amount of causes for such conditions. In accordance to referenced literature, Dr. Benton further stated when adults have sex with children and there's not a total regard for comfort, sometimes there can be injury to either the tissues or the urethra such that afterward the child experiences burning upon urination.
Dr. Lincoln Paine, qualified as an expert in the field of psychiatry, saw M.M. when she was admitted to River Oaks Hospital. He noted all of the behavior problems she was having and testified that her hallucinations could be the result of PTSD, following the alleged sexual abuse. On the other hand, according to the doctor, the hallucinations could be the result of a psychotic disorder, not related to her environment. After five days in the hospital, the doctor believed the child was doing better, and he no longer felt she had a psychotic process. He concluded she had PTSD instead and that she was depressed. He placed her on medication, Risperdal, which eliminated the hallucinations and calmed her down. Dr. Paine testified that post traumatic stress can begin soon after a traumatic event or years later. The doctor testified that the child's relationship with her mother was mixed and that she seemed to be angry with her mother at first. She expressed a desire to live with her biological father. The doctor testified that he did not speak with the child about the sexual abuse, which would ordinarily be addressed by her counselor in therapy. His work was to address the behavioral symptoms. He admitted that any traumatic event, other than sexual abuse, could have caused her symptoms.
Janet Buescher, qualified by the court as an expert in the field of clinical social work, testified that she initially saw M.M. on January 6, 2004, because she was hearing voices and having difficulty sleeping and because her behavior had deteriorated. She was having anxiety, was sometimes unable to leave her mother, and sometimes wanted to live with her biological father. She was in a chaotic state and very fearful. Ms. Buescher first diagnosed the victim with separation anxiety disorder, but after hearing of her statements at River Oaks and to the police, she diagnosed her with PTSD following sexual abuse. Nonetheless, Ms. Buescher acknowledged she could not confirm the traumatic cause of the victim's condition. She testified that the recall of children with PTSD is sometimes there and sometimes not. It is not uncommon to get different answers to a question from such a child on different occasions. While talking to the victim at a time when the instant trial was scheduled, the victim told her the defendant put his "thing" in her private almost every day from the time she was three years old until he left her mother. Ms. Buescher did not speak with the victim about the details of the sexual abuse. In the four appointments Ms. Buescher had with the victim prior to her going to River Oaks, M.M. did not tell Ms. Buescher anything about sexual abuse. Ms. Buescher testified that M.M. is a strong-willed child with a serious power problem, meaning she has the need to not let anyone control her and a need to win. She expresses concerns about pitting her friends against each other and is manipulative. She has problems with her temper. She had strong feelings about her mother and biological father. She was clingy with her mother at times and angry with her at other times. At times she seemed to have a strong attachment to her father and wanted to live with him.
The defendant testified at trial that he believed M.M. was a normal child, but that she was too old at age six to be sleeping in bed with him and her mother. He denied ever telling the police that he slept in the nude when the victim was in the bed and testified that he did not sleep in the nude when the victim was present. He strongly denied that he ever acted inappropriately with the victim, and he specifically denied touching her vagina or having sexual intercourse with her. He stated that because of the accusations against him, he was incarcerated and prohibited from seeing his son for three years. The defendant denied ever having gone to Mulberry Elementary to attend a parent luncheon day. He stated he was required by a restraining order and by his bond agreement to stay away from M.M. and her mother. He stated he was instead in New Orleans working in a chemical plant that day.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 (La. App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83.
The defendant argues the jury's verdict herein is not supported by the record because the victim's testimony was unreliable. We disagree. The victim convincingly and consistently recounted that the defendant touched her private part and put his thing in her private part, instances of sexual abuse by the defendant. The victim also stated she experienced burning when she urinated after the incidents. Medical testimony indicated trauma is among the limited causes of urinary burning. Any penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient sexual penetration. State v. Ross, XXXX-XXXX, p. 11 (La. App. 3 Cir. 12/17/03), 861 So.2d 888, 895, writ denied, XXXX-XXXX (La. 6/25/04), 876 So.2d 829. The testimony of the victim alone is sufficient to prove the elements of the offense. State v. Orgeron, 512 So.2d 467, 469 (La. App. 1 Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). The jury was reasonable in rejecting the defendant's hypothesis of innocence. After a thorough review of the record, viewing the evidence in the light most favorable to the State, we are convinced that any rational trier of fact could have found that the evidence, to the exclusion of every reasonable hypothesis of innocence, was sufficient to prove all of the elements of aggravated rape. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant avers the trial court erred in denying his supplemental motion for a new trial based on jury misconduct and refusing to grant a hearing on whether jury misconduct occurred. The defendant specifically notes that after the trial, the defense counsel received a letter from one of the jurors informing him that during a trial recess, in the deliberation room, an unnamed juror expressed her belief that the defendant was guilty. The defendant also notes there was evidence that several jurors were concerned about being sequestered overnight and were, therefore, not diligent in deliberating.
The denial of a motion for a new trial is not subject to appellate review except for error of law. La. Code Crim. P. art. 858. The decision on a motion for new trial rests within the sound discretion of the trial judge. We will not disturb this ruling on appeal absent a clear showing of abuse. State v. Henderson, 99-1945, pp. 15-16 (La. App. 1 Cir. 6/23/00), 762 So.2d 747, 758, writ denied, 2000-2223 (La. 6/15/01), 793 So.2d 1235. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. State v. Haygood, 26, 102, p. 6 (La. App. 2 Cir. 8/17/94), 641 So.2d 1074, 1079, writ denied, 94-2373 (La. 1/13/95), 648 So.2d 1337. Generally, a motion for new trial will be denied unless injustice has been done. See La. Code Crim. P. art. 851.
The jury shield law is now found in La. Code Evid. art. 606B, which provides:
Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
This article clarifies the previous jury shield law, La. R.S. 15:470, but does not change the requirements for overcoming the prohibition against juror testimony. The prohibition contained in Article 606B, and previously set forth in La. R.S. 15:470, is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. See State v. Graham, 422 So.2d 123, 136 (La. 1982). Only well-pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify. Unless such pleadings are made with particularity, jury members are not competent to testify. See State v. Duncan, 563 So.2d 1269, 1272 (La. App. 1 Cir. 1990) (Defendant's well-pleaded allegation of prejudicial juror misconduct was sufficient to overcome the prohibition against a juror testifying).
The language of Article 606B permits a juror to testify regarding whether any outside influence was improperly brought to the jury's attention. The trial court did not abuse its discretion in excluding evidence of alleged misconduct in this case. Communications among jurors, although violating the trial court's instruction, do not amount to "outside influences" or "extraneous" information. The defendant alleges no facts suggesting the jury based its verdict on prohibited factors such as coercion by a party or inadmissible evidence of other crimes obtained from an out-of-court source. Moreover, the defendant has not alleged the jurors were incompetent due to mental illness, substance abuse, or other objectively verifiable conduct. He argues that one or more of the jurors might have improperly influenced other jurors by expressing his opinion at an inappropriate time and that the jurors were not diligent in deliberating. The factors that lead a juror to his decision are squarely within the prohibition of Article 606B against juror testimony: "a juror may not testify ... to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict... or concerning his mental processes ... therewith...."
We find the intra-jury communications, if they took place, were not improper outside influences, extraneous prejudicial information, or objectively verifiable misconduct. This court concludes the trial court properly denied the defendant's motion for new trial on this basis and attendant request to examine the jurors. Thus, this assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Pursuant to La. R.S. 46:1844W(1), initials are used to protect the identity of the victim.
[2] The defendant contends medical testimony that the victim was suffering from post traumatic stress disorder (PTSD) caused by sexual abuse impermissibly bolstered the victim's testimony. Citing State v. Chauvin, XXXX-XXXX (La. 5/20/03), 846 So.2d 697, the defendant argues Dr. Paine's expert testimony of PTSD was used in this case for the purpose of substantively proving abuse occurred. Under La. Code Evid. art. 103A(1) and La. Code Crim. P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. However, the defendant did not object to Dr. Paine's testimony. To the extent the defendant is attempting to address this issue on appeal, it is not preserved for appellate review.
[3] The instant offense was charged with a time period (between 2001 and 2002) for the date of commission. During that time period, La. R.S. 14:41 and La. R.S. 14:42 were amended to add "oral" (2001 La. Acts No. 301, § 1). Further, the age element of La. R.S. 14:42A(4) was increased to thirteen years of age (2003 La. Acts No. 795, § 1).