943 So.2d 1143 (2006)
STATE of Louisiana
v.
Arien Lamar DELCO.
No. 2006 KA 0504.
Court of Appeal of Louisiana, First Circuit.
September 15, 2006.
*1145 Bertha M. Hillman, Thibodaux, Counsel for Defendant/Appellant, Arien Lamar Delco.
Matthew Hagan, Juan Pickett, Assistant District Attorneys, Houma, Counsel for Appellee, State of Louisiana.
Before: CARTER, C.J., WHIPPLE and MCDONALD, JJ.
CARTER, C.J.
The defendant, Arien L. Delco, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. Following a trial by jury, the defendant was found guilty as charged. The trial court denied the defendant's motions for post verdict judgment of acquittal and for new trial. The defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.
The defendant appeals, alleging the evidence is insufficient to support his conviction and assigning as error the replay of his videotaped statement. For the following reasons, we affirm the conviction and sentence.

Statement of Facts
On or about June 17, 2004, just after 5:00 p.m., a shooting incident occurred at the defendant's residence in Houma, Louisiana. The shooting occurred after the victim, Charles Breaux, approached the defendant's residence, and the two men engaged in a verbal altercation. When the victim exited the defendant's home, the defendant retrieved a .380 caliber handgun from his bedroom. As the victim stood under the carport of the defendant's residence, the defendant shot the victim in the head. At approximately 5:17 p.m., the defendant called 911 and reported the shooting. During the 911 report, the defendant stated that he had shot an individual who came to his residence and attempted to attack him. The victim died as a result of the gunshot wound.

Sufficiency of the Evidence
The defendant avers that there was insufficient evidence to support the second degree murder conviction. The defendant concedes that he killed the victim; however, the defendant contends that he acted in self-defense in acquiring the gun. The defendant specifically avers that the gun accidentally discharged when the victim swung his hands at the defendant; he did *1146 not specifically intend to shoot the victim. In the alternative, the defendant avers that he is guilty of negligent homicide. In the further alternative, the defendant argues that he should be found guilty of manslaughter, as the defendant and the victim were engaged in a heated verbal altercation just prior to the shooting.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and adopted by the Louisiana Legislature in enacting LSA-C.Cr.P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. State v. Graham, 02-1492 (La. App. 1 Cir. 2/14/03), 845 So.2d 416, 420.
The defendant was found guilty of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1A(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or the facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La.12/6/96), 684 So.2d 923. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Henderson, 99-1945 (La. App. 1 Cir. 6/23/00), 762 So.2d 747, 751, writ denied, 00-2223 (La.6/15/01), 793 So.2d 1235.
In contrast to second degree murder, negligent homicide is defined as the "killing of a human being by criminal negligence." LSA-R.S. 14:32A. "Criminal negligence exists when, although neither specific nor criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." LSA-R.S. 14:12.
The first state witness, Willie Bolden, Jr., owns a home directly across the street from the defendant's residence and next door to the victim's residence. Before the shooting incident, Bolden often observed the defendant and the victim socializing with each other at their residences. At the time of the shooting, Bolden was sitting on the front step of his home. Bolden initially observed the victim as he exited a vehicle and entered his own residence. After remaining at his home for a brief period of time, the victim walked to the defendant's residence and yelled, "Come outside, Bitch." The defendant came outside and an argument ensued. The defendant told the victim to leave, "[a]nd the next thing you know, Arien came back, put a gun to Charles's face. Charles slapped the gun out with his left hand. Arien told him get out his yard, get out his *1147 face. Put the gun back in his face. He shot him. Charles fell to the ground." Bolden stated that his view of the area was unobstructed, and the victim did not have a weapon.
Bolden further explained that the defendant and the victim were standing face to face, under the carport of the defendant's residence, at approximately an arm's length distance, when the defendant raised the gun to the victim's face, near his forehead. The victim used his left hand to push the gun away from his face, and the victim continued to argue with the defendant as the defendant instructed him to leave. The defendant raised the gun again and shot the victim. Bolden indicated that no one else was in the defendant's driveway at the time of the shooting. Although Bolden observed two individuals pass on bicycles and a third individual at the end of the street, none of these individuals were in the general vicinity at the time of the shooting. On cross-examination, Bolden confirmed that his view of the defendant was obstructed by the victim's back.
Defense witness Terry Brown stated that he spoke to the victim just prior to the incident, and the victim stated that he was going to physically attack the defendant. Brown walked to the defendant's residence along with the victim but remained outside. Brown listened as the verbal altercation ensued. Brown stood at the end of the driveway (about 20 feet away) as the victim and the defendant exited the home. Brown stated that the defendant pointed the gun at the victim's head. The victim "swung at the gun, the gun went off andhe fell." Brown ran across the street to the victim's residence and called 911. According to Brown, Bolden was standing in his doorway across the street at the time. During cross-examination, Brown conceded that he was more focused on the gun than Bolden. Brown further confirmed that the defendant and the victim did not struggle over the gun prior to its discharge.
Officer J. Chapman of the Houma Police Department confirmed that the carport area of the defendant's residence was not lit. However, Officer S. Welter testified that in the month of June it does not begin to get dark outdoors until between 7:00 p.m. and 8:00 p.m.
At approximately 5:30 p.m., Officer Chapman was dispatched to the defendant's residence to conduct documentation and evidence collection. Officer Chapman collected the semi-automatic handgun used by the defendant.[1] Officer Chapman confirmed that the weapon had to be manually cocked before a shell would enter the chamber to allow the firing of the weapon.
Dr. Feaster Fitzpatrick, an expert in pathology and autopsies, conducted the autopsy of the victim. Dr. Fitzpatrick described the victim's gunshot wound as a close-range gunshot wound to the forehead. He specified that the weapon was either touching or very close to the victim's forehead when it was fired.
Officer Welter was dispatched to the scene at approximately 5:18 p.m. and arrived approximately two minutes later. Officer Welter was the first officer on the scene. When Officer Welter approached the defendant, the defendant stated as follows, "I shot him. I'm the one you're looking for." At that point, Officer T. Voisin escorted the defendant to Detective B. Tabor's police unit.
*1148 Detective Tabor conducted a pat-down search of the defendant before placing him in the unit to be transported to the police department. While in the police unit, the defendant stated several times that he shot the victim. Detective Tabor repeatedly instructed the defendant to wait until they arrived at the police station before making any statements. Detective Tabor stated that he did not question the defendant; however, the defendant proceeded to inform the detective that he was watching television when the victim arrived at his residence, and the verbal altercation ensued. The victim told the defendant that he wanted to commence a physical altercation and asked the defendant to come outside. As the victim stepped out of the home, the defendant retrieved his gun from his bedroom. The defendant followed the victim outside. The victim pushed the defendant's forehead with his fingers and called the defendant several derogatory names. The defendant advised that at that point, he placed the gun to the victim's forehead and shot him. The defendant did not mention a struggle or misfire. When they arrived at the police station, the defendant was immediately booked and advised of his Miranda rights.[2]
Sergeant J. McElroy and Detective T. Theriot conducted a videotaped interview of the defendant. The videotape was first played before the jury during the state's direct examination of Detective Theriot. During the interview, the defendant stated that he and the victim were friends "off and on" prior to the shooting. When the victim arrived at the defendant's residence, the defendant and his great aunt were present in the home.[3] The victim pounded on the door, opened it, and stood in the doorway. The victim accused the defendant of telling a female that the victim stole an unspecified amount of money from the defendant. The defendant denied making such a statement. The victim continued to make such accusations and the defendant told the victim that he was being disrespectful and told him to leave. The victim cursed the defendant and told the defendant to come outside, stating that he would "whip" the defendant's "ass." The victim then stepped outside of the home, and the defendant retrieved his gun and a cigarette. The defendant exited the home.[4] The defendant showed the victim the gun, and the victim pushed the defendant's forehead with his fingers. The defendant then shot the victim. The defendant stated that he shot the victim in self-defense.
During his trial testimony, the defendant stated that he did not intentionally shoot the victim; rather, he retrieved the gun out of fear. The defendant also grabbed a cigarette and a cigarette lighter. When asked whether he obtained the cigarette to calm himself, the defendant agreed and added that he could not smoke in the home because children lived there. The defendant exited the home. The victim began walking away but turned back *1149 around and approached the defendant. The defendant held the gun up. The victim swung his left hand toward the gun and it accidentally discharged. When asked why he did not simply close the door after the victim stepped outside of the defendant's home, the defendant stated that he was afraid. The defendant further stated that he was nervous when he made statements to the police.
During cross-examination, the defendant reiterated that the victim was being disrespectful just prior to the shooting. The defendant retrieved his gun because he did not know what the victim "had in store" for him outside. The defendant also noted that he was angry because the victim was making accusations against him and threatening him. To the defendant's knowledge, the victim did not have any weapons. When asked why he did not simply lock the door after the victim exited the residence instead of retrieving his weapon and following the victim, the defendant stated that he did not know what the victim was capable of doing. The defendant also noted that he was concerned about the victim coming back at a later time to ensue a physical altercation. The defendant stated that the gun was already cocked when he retrieved it, as he had cocked it prior to placing it under his pillow. The defendant acknowledged aiming the gun in the air toward the victim's face. The defendant could not recall whether his finger was on the trigger at the time of the discharge. When the victim hit the defendant's hand, the gun fired.
Lisa Sims, the victim's sister, indicated that the defendant and the victim were friends prior to the shooting incident and would often visit each other. Sims was informed of the shooting shortly after it occurred and immediately went to the defendant's residence. At the time of her arrival, the defendant was in a police unit. Sims questioned the defendant as to why he shot her brother. According to Sims's testimony, the defendant stated, "Charles shouldn't have been f-ing with me." During cross-examination, Sims confirmed that she wrote the defendant a letter to inform him that she had forgiven him and that she, due to the close relationship that the defendant and her brother had prior to the shooting, believed that the defendant did not intend to kill her brother.
At the outset, we note that the defendant's specific intent to kill the victim may be properly inferred from his act of pointing the gun at the victim's head and firing. Henderson, 762 So.2d at 751. The jury obviously rejected the version of the facts presented during the defendant's trial testimony and concluded that the shooting was not accidental. We find such a rejection reasonable. The statements made by the defendant to the police and to Lisa Sims immediately after the incident did not convey an accidental shooting. While the defendant during the trial claimed that he was nervous while making statements to the police and did not mean to convey that the shooting was intentional, our review of the videotaped interview reveals otherwise. The defendant was relatively calm during the interview and seemed eager to present his version of the facts. The defendant gave a succinct and lucid account of what he claimed to be facts of the incident. The defendant never indicated that the gun was fired accidentally. The defendant specifically indicated that he shot the victim after the victim pushed the defendant's forehead with his fingers. According to Bolden, the defendant re-raised and fired the gun after the victim swung his hand and knocked the gun out of his face.
The defense eyewitness, Brown, stated that the gun went off when the victim swung at the gun. However, Brown's testimony *1150 was not necessarily contrary to the conclusion that the shooting was intentional. Moreover, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La.App. 1 Cir. 1984). If there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is of the weight of the evidence, not its sufficiency. Richardson, 459 So.2d at 38. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Creel, 540 So.2d 511, 514 (La.App. 1 Cir.), writ denied, 546 So.2d 169 (La.1989). Thus, we reject the defendant's contention that the evidence supports a conviction of negligent homicide.
Further, any rational trier of fact could find beyond a reasonable doubt that the defendant did not act in self-defense in shooting the victim. When a defendant charged with a homicide claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Rosiere, 488 So.2d 965, 968 (La.1986). At the time of the offense, Louisiana Revised Statutes 14:20[5] provided in pertinent part: "A homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." However, LSA-R.S. 14:21 provides: "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."
The victim never actually attempted to physically attack the defendant, and there is absolutely no evidence that the victim was armed during the verbal altercation. Moreover, a theory of self-defense is inconsistent with the defendant's claim of accidental discharge made during his trial testimony. We note that the defendant argues on appeal that the two theories, accidental discharge and self-defense, are not mutually exclusive. The defendant avers that he retrieved the weapon in self-defense but did not intentionally fire it. However, the defendant voluntarily exited his home to follow the victim outside, and during his trial testimony, the defendant stated that locking his door after the victim exited would not have prevented a future brawl with the victim. By killing the victim, the defendant eradicated any concern of a future brawl. Based on our review of the evidence, we do not find that the defendant could have reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm at the time he retrieved the gun. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984). No such alternate hypothesis exists in the instant case.
We will now consider the defendant's alternative manslaughter argument. In accordance with LSA-R.S. 14:31A(1), manslaughter is a homicide that would be a first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average *1151 person of his self-control and cool reflection. "Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. . . ." See LSA-R.S. 14:31A(1). "Sudden passion" or "heat of blood" are not elements of the offense of manslaughter; rather they are mitigatory factors in the nature of a defense that tend to lessen the culpability. State v. Rodriguez, 01-2182 (La.App. 1 Cir. 6/21/02), 822 So.2d 121, 134, writ denied, 02-2049 (La.2/14/03), 836 So.2d 131. Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. Rodriguez, 822 So.2d at 134.
It is clear that the defendant and the victim had a verbal altercation prior to the shooting. However, based on the instant circumstances, the jury could have reasonably concluded that an average person would not have been deprived of his self-control and cool reflection. The defendant could have closed and locked his door and contacted the police after the victim exited the residence. Instead, the defendant decided to retrieve his gun, along with a cigarette and a cigarette lighter. Again, in presenting testimony in support of his accidental discharge theory, the defendant indicated that he was not angry enough to intentionally shoot the victim. The defendant testified, "Anyway, I was mad; but it wasn't nothing to shoot him [over], you know." We find that the defendant failed to prove any mitigating factors by a preponderance of the evidence.
Due to the foregoing conclusions, this assignment of error lacks merit.

Replay of Defendant's Videotaped Statement
The defendant avers that the trial court committed reversible error in allowing the state to replay the defendant's videotaped statement. The defendant does not question the admissibility of the actual evidence presented at trial; rather, the defendant argues that the evidence was repetitive and incurably prejudicial.
At the outset, we note that the defendant's appeal brief incorrectly states that the defendant's videotaped statement was replayed during the state's rebuttal closing argument. The videotaped statement was initially played during the state's case-in-chief and replayed as rebuttal evidence, not during closing arguments. Nonetheless, the defendant raises a relevant argument on appeal regarding the replay of the videotape.
The state has the right to rebut evidence adduced by a defendant. LSA-C.E. art. 611E. The prosecution is entitled in rebuttal to explain, repel, counteract, or contradict evidence adduced by the defense. It may not, however, introduce new issues or facts, or reserve part of its case-in-chief for rebuttal. State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 981. Control of the evidence presented by the state on rebuttal is within the sound discretion of the trial court and will not be disturbed except in extreme cases, such as when evidence is kept back deliberately for purposes of deceiving and obtaining undue advantage. State v. Williams, 445 So.2d 1171, 1181 (La.1984).
The defense directs this court to State v. Davis, 246 La. 383, 164 So.2d 589 (1964), wherein serious and prejudicial error was found when the trial judge allowed two deputies, in rebuttal, to substantially repeat what they had testified to during the state's case-in-chief. This was deemed improper rebuttal testimony, as it was merely *1152 a repetition of negative testimony given in the case-in-chief. The Louisiana Supreme Court noted that in order to convict the defendant the state was relying entirely on three purported confessions made by the defendant following his arrest, while the defendant was relying on a plea of self-defense. Davis, 164 So.2d at 591. This having been anticipated by the state, it had elicited from two deputy sheriffs, during its case-in-chief, statements to the effect that when Davis "confessed" he never at any time claimed he shot the victim in defense of himself or his wife. The defendant's trial testimony provided otherwise. Over defense objection, the state was allowed to recall these same two deputies to the stand and simply have them repeat and reiterate their testimony that the defendant did not state at any time during his "confessions" that he had killed the victim in self-defense. In finding reversible error, the court in part stated:
It is obvious to us that such attempted rebuttal was particularly prejudicial to the defendant as it could have had no other effect than to place the weight of these public officials in the scales of justice. It is well to note here that all of the witnesses to these so-called "confessions" were either deputy sheriffs or the assistant district attorney who tried the case, the latter, in his argument to the jury, emphasizing time and again that because of his personal participation in the taking of these "statements" he knew the deputies were telling the truth. And although he did not take the stand in this so-called rebuttal effort, he nevertheless, argued consistently to the jury that Davis had never told him as the assistant district attorney he acted in self-defense.
Davis, 164 So.2d at 592 (footnote omitted) (emphasis added).
The court further noted that the injury was compounded and the jury further prejudiced when the district attorney, who did not try the case but was in the courtroom throughout the trial as a spectator, "added his personal prestige, as well as the weight of his office, in the scales against the defendant" when he made a special plea to the jury in closing as follows:
Now, in this case, the only thing you've got to look for, the only thing in my opinion which is important, is whether or not you are going to believe the duly constituted law officials of this Parish, including my own assistant, or whether or not you're going to believe this man, who through his own admission and who through cross-examination, is a convicted criminal. That's what you've got to decide in this case and that's the only question you've got to decide.

Davis, 164 So.2d at 592 (emphasis added).
The instant case is clearly distinguishable from Davis. First, herein the defendant's statement cannot be labeled as "purported" since it was evidenced by video. Moreover, the videotaped statement itself was introduced during the case-in-chief along with the testimony of one of the officers who conducted the interview. Also, the state's case did not rely entirely on the defendant's videotaped statement. Evidence presented by the state also included the testimony of eyewitnesses Bolden and Sims. Moreover, the evidence at issue herein does not consist of statements by public officials, and there was no prejudicial comment by the state.
As stated, the evidence at issue was not introduced for the first time on rebuttal, but initially was admitted during the state's case-in-chief. The evidence was admitted on rebuttal to contradict the defendant's claim, first presented at trial, that the gun was discharged accidentally. In State v. Guiden, 399 So.2d 194, 199 (La. 1981), cert. denied, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982) and State v. *1153 Bonanno, 373 So.2d 1284, 1292 (La.1979), the Louisiana Supreme Court held that a statement properly admitted during the case-in-chief may be replayed or repeated during closing arguments. That being the case, we conclude that replaying the tape in the case sub judice was no more prejudicial than replaying the tape during closing arguments would have been. While the jury heard the statement twice, this fact alone does not mean it gave undue weight to the statement's substance.
The verdict rendered herein was surely unattributable to the replay of the defendant's videotaped statement, and the defendant has not demonstrated any resulting prejudice. Thus, even if we were to conclude that the trial court abused its wide discretion in allowing the state to replay the videotape as rebuttal evidence, we find such an error harmless beyond a reasonable doubt. See Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); see also LSA-C.Cr.P. art. 921.
This assignment of error has no merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] At the time of the discovery, the weapon was positioned on a bed in the defendant's bedroom.
[2] The record indicates that the defendant invoked his right to an attorney while he was in the booking area. Thereafter, the defendant was instructed to refrain from making a statement. The defendant later waived his rights after being re-advised and provided a statement to interrogating officers. The defendant does not contest the voluntariness of the statement and conceded during his trial testimony that the interrogating officers were unaware of his prior invocation.
[3] The defendant indicated that his great aunt was in another portion of the home during the incident and was hearing impaired. According to the defendant, she did not witness the incident.
[4] The defendant stated that another individual was standing outside but was not involved in the altercation. The defendant referred to the individual as "Prune."
[5] Louisiana Revised Statutes 14:20 was amended by 2006 La. Acts No. 141, § 1.