# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

### 2023 KA 1254

STATE OF LOUISIANA

VERSUS

KAMRON KAJON JACQUOT

JUN 27 2024

Judgment Rendered: _____

* * * * * *

On Appeal from the Thirty-Second Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Docket No. 826094

Honorable David W. Arceneaux, Judge Presiding

* * * * * *

Joseph L. Waitz, Jr.
District Attorney
Joseph S. Soignet
Special Prosecutor
J. Christopher Erny
Amanda Mustin
Assistant District Attorneys
Houma, Louisiana

Counsel for Appellee
State of Louisiana

Prentice L. White
Baton Rouge, Louisiana

Counsel for Defendant/Appellant
Kamron Kajon Jacquot

* * * * * *

**BEFORE: McCLENDON, HESTER, AND MILLER, JJ.**

**McCLENDON, J.**

Defendant, Kamron Kajon Jacquot, was charged by grand jury indictment with one count of first degree murder (count one), in violation of LSA-R.S. 14:30, and one count of attempted first degree murder (count two), in violation of LSA-R.S. 14:27 and 14:30. He entered a plea of not guilty to the charges and, following a jury trial, was found guilty of the responsive verdicts of second degree murder, in violation of LSA-R.S. 14:30.1, and attempted manslaughter, in violation of LSA-R.S. 14:27 and 14:31. The trial court denied defendant's motion for post-verdict judgment of acquittal. Thereafter, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count one and twenty years at hard labor on count two, to run concurrently.[1] Defendant now appeals, asserting that the evidence was insufficient to sustain his second degree murder conviction. For the following reasons, we affirm defendant's convictions and sentences.

## FACTS

On December 31, 2020, defendant attended a New Year's Eve party in the Jolie Oaks subdivision in Thibodaux, Louisiana. A physical altercation ensued between defendant and Eric Thibodaux, one of the victims, after Thibodaux approached Jolie Hickox, with whom both he and defendant had a relationship, and began whispering in her ear. The altercation escalated, after which Thibodaux and Matthew Badeaux, the second victim, were both shot multiple times. Badeaux survived, but Thibodaux did not. Several witnesses identified defendant as the shooter, and he was later arrested and charged with the first degree murder of Thibodaux and the attempted first degree murder of Badeaux.[2]

---

[1] The trial court ordered that defendant be "committed to the custody of the Louisiana Department of Public Safety and Corrections to serve a sentence of life without benefit of probation, parole or suspension of sentence" for his second degree murder conviction but did not specify the sentence was to be served at hard labor. However, "a sentence committing a prisoner to the Department of Corrections is necessarily at hard labor." **State v. Lawson**, 2004-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 621 n.2; see also **Rochon v. Blackburn**, 97-2799 (La.App. 1 Cir. 12/28/98), 727 So.2d 602, 604.

[2] The bill of indictment listed Thibodaux and Badeaux by their initials, and defendant similarly refers to them by their initials in his appellate brief. However, LSA-R.S. 46:1844(W) does not prohibit the use of the victims' names in this case and, thus, we refer to them as such.

2

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, defendant asserts that the evidence presented at trial was insufficient to support his second degree murder conviction. Specifically, defendant contends that the State failed to disprove beyond a reasonable doubt that the homicide was committed in self-defense. Alternatively, defendant suggests that the shooting was committed in "sudden passion" and in the "heat of blood" such that the responsive verdict of manslaughter should be entered. He does not contest the sufficiency of the evidence as it relates to his attempted manslaughter conviction.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; LSA-Const. art. I, § 2. The standard of reviewing a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Coleman**, 2021-0870 (La.App. 1 Cir. 4/8/22), 342 So.3d 7, 11, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460. The **Jackson** standard of review, incorporated in LSA-C.Cr.P. art. 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Welch**, 2019-0826 (La.App. 1 Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Coleman**, 342 So.3d at 12.

Second degree murder is defined, in pertinent part, as a killing committed "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" LSA-R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow

3

his act or failure to act." LSA-R.S. 14:10(1). Specific intent can be formed in an instant. **State v. Cousan**, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **Welch**, 297 So.3d at 27. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **Id.**

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." LSA-R.S. 14:20(A)(1). However, an aggressor may not claim self-defense without showing he first withdrew from the conflict in good faith and in such a manner that his adversary knew or should have known of his intention to withdraw and discontinue the conflict. See LSA-R.S. 14:21. When self-defense is raised by the defendant, the State has the burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. **State v. Brown**, 2023-0293 (La.App. 1 Cir. 11/28/23), 380 So.3d 18, 23. Thus, the issue in this case is whether a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant did not kill the victim in self-defense. **Id.**

The responsive verdict of manslaughter is defined, in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

LSA-R.S. 14:31(A)(1); see also LSA-C.Cr.P. art. 814(A)(3).

The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are mitigating factors which the defendant must establish by a preponderance of the evidence. See **State v. Dearmas**, 2022-0494 (La.App. 1 Cir. 11/4/22), 356 So.3d 9, 14, writ denied, 2022-01839 (La. 5/23/23), 360 So.3d 1254; **State v. Mellion**, 2021-1116 (La.App. 1 Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319,

4

214 L.Ed.2d 141 (2022). If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **Mellion**, 342 So.3d at 48. Provocation and time for cooling off are determinations made by the trier of fact under the standard of the ordinary person with ordinary self-control. **Dearmas**, 356 So.3d at 15. Thus, an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors had not been established by a preponderance of the evidence. **State v. Veal**, 2022-0641 (La.App. 1 Cir. 12/22/22), 2022 WL 17841516, *4 (unpublished).

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **Mellion**, 342 So.3d at 48. Provocation testimony is an issue of credibility. **Mellion**, 342 So.3d at 47. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not re-assess the credibility of witnesses or reweigh the evidence to overturn a determination of guilt. **State v. Bessie**, 2021-1117 (La.App. 1 Cir. 4/8/22), 342 So.3d 17, 23, <u>writ denied</u>, 2022-00846 (La. 9/20/22), 346 So.3d 802.

At trial, Dr. Michael Defatta was accepted as an expert in forensic pathology. Dr. Defatta performed the autopsy on Thibodaux on January 4, 2021. Thibodaux was six-feet five-inches tall and weighed one-hundred and ninety pounds. The autopsy revealed abrasions on Thibodaux's chin, neck, left arm, and right shoulder, which Dr. Defatta testified could have been a result of injuries sustained in a fight. Seven gunshot entry wounds were documented, including wounds to Thibodaux's (1) left upper back, (2) right lateral hip, (3) right upper buttock, (4) back of the right forearm, (5) back of the left forearm, (6) right lower back, and (7) right buttock. With the exception of the gunshot wound to the right lateral hip, all of the gunshot wounds were inflicted from behind. The gunshot wound to the right lower back was fatal, given that the bullet traveled into Thibodaux's chest cavity where it pierced his lung and heart.

5

Matthew Badeaux, the other victim, was twenty-one years old and attending Nicholls State University at the time of trial. Badeaux testified that on the night of the shooting, he and some friends decided to go to the party in Jolie Oaks. Most of the night, Badeaux remained in the garage until he saw a large crowd of people gather in the front yard. As Badeaux approached the group of people, he saw Thibodaux, his fraternity brother, emerge from the group of people fighting. Badeaux asked Thibodaux where his ride was and began walking with him down the street toward the parked vehicles. Badeaux testified that he and Thibodaux had walked a good distance from the house where the party took place when he felt an intense burning sensation in his left shoulder. Badeaux realized he had been shot, but claimed he did not see who had shot him. Badeaux was shot in his hand, shoulder, lower back, rib, and legs. However, the State introduced bodycam footage from that night wherein Badeaux told the police he had seen a gun and identified a black man as the shooter. Badeaux estimated a couple of minutes elapsed between when he and Thibodaux started walking to when he was shot.

Detective Chris DeHart with the Terrebonne Parish Sheriff's Office testified that defendant was identified as the shooter by eyewitness Lauryn Ordoyne. Detective DeHart also stated that numerous videos were recorded at the party and posted on social media, some of which were played for the jury. Several of them depicted the initial physical altercation between Thibodaux and defendant. Subsequent videos showed Michael Guidry and defendant fighting. Another video, which Detective DeHart testified was recorded less than a minute before the shooting, showed Thibodaux, Badeaux, and Michael Guidry walking down the street toward the parked vehicles. Additionally, a video, which was recorded by defendant as he fled, depicted injuries to defendant's right eye and mouth. It was Detective DeHart's understanding that defendant's injuries were caused by Michael Guidry and Jhy Orgeron, not Thibodaux.

Detective Mitchell Legendre, the Assistant Chief of Detectives with the Terrebonne Parish Sheriff's Office, testified that he responded to the scene of the shooting and thereafter arrested defendant on January 1, 2021, at an apartment. After advising

defendant of his **Miranda**[3] rights, Detective Legendre asked him if the gun was in the apartment. According to Detective Legendre, defendant responded that he threw the gun over the Schriever overpass and said he was the only shooter. Defendant also told Detective Legendre that he shot because he was scared. Efforts to retrieve the gun were unsuccessful, and the gun had not been recovered at the time of trial. Detective Legendre testified the investigation revealed that the distance between the house and the location where Thibodaux and Badeaux were shot was between 150 and 170 feet.

Lauryn Ordoyne testified that she saw defendant, whom she knew from high school, fighting at the party. Ordoyne and her friends decided to leave the party and, while waiting by their vehicle for another friend, she saw two guys walking away from the party. Ordoyne saw defendant walking toward the guys, and she heard defendant ask, "Where y'all going now?" Ordoyne thought that defendant was looking down at his phone; however, her friend, Hunter Trosclair, told her that defendant had a gun. She then heard the gunshots and saw defendant shooting. Ordoyne got in Trosclair's vehicle, they left, and she called 911. Ordoyne testified that defendant was walking quickly toward the guys, and it appeared "[h]e was going after them."

Sammi Lodrigue, at whose apartment defendant was arrested, testified that defendant told her after the party that he had gotten into an argument with a guy and had slapped him. Lodrigue thought the fight had something to do with a girl. Defendant told Lodrigue that the guy had called him the "N" word.[4] Lodrigue said that defendant called her from the party and said he was jumped. Defendant said that he was hurt, and Lodrigue heard him crying, which she said was uncommon. Lodrigue testified that when she saw defendant, his face "was busted up [and] he was bleeding all over his face."

Jolie Hickox testified that she graduated from South Lafourche High School with Thibodaux, and, while both were attending Nicholls, they started a romantic relationship. Hickox said she was also in a non-exclusive relationship with defendant. At the party, Thibodaux approached Hickox inside the house, and defendant told Thibodaux to get

---

[3] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[4] During Lodrigue's testimony, the State requested and was granted permission to treat her as an adverse witness.

away from her.  Hickox said Thibodaux initially walked away, but came back to whisper in her ear.  Defendant slapped Thibodaux, and then all three separated.  Later, Thibodaux approached Hickox again, and defendant slapped him a second time.  Hickox testified that she saw Thibodaux and defendant outside talking to one another a few minutes later and then saw the fight start.

The first fight was only between Thibodaux and defendant.  After the two were pulled apart, Hickox said that defendant appeared angry, and he started a second fight with Thibodaux and Thibodaux's friends.  The second fight ended and another fight involving a lot of people began.  Hickox recalled seeing Jhy Orgeron and Michael Guidry in the fight, but not Thibodaux, and she recalled seeing defendant on the ground.  After the fight broke up, Hickox saw people walking down the street and then heard the gunshots.  She did not see who was shooting or initially see who got shot.  Hickox said she left the party and was immediately contacted by defendant.  Defendant told Hickox that he was the shooter and that he loved her.  He later texted her asking if she was involved with Thibodaux and telling her that her friend was dead.  Hickox testified that she never saw Thibodaux start any confrontation that night.  On cross-examination, Hickox agreed that defendant was outnumbered during the subsequent fights and, at one point, was at the bottom of the fighting pile.

Cullen Nickolyn was a friend of defendant and saw Thibodaux, whom he did not know, whisper in Hickox's ear.  Nickolyn testified that Thibodaux seemed disrespectful and smiled when defendant told him to stop.  After Thibodaux whispered in her ear again, defendant slapped him.  Nickolyn said that Thibodaux smiled again and turned around.  Sometime later, Thibodaux and defendant confronted one another by the front door of the house, and defendant slapped Thibodaux again.  A fight ensued, but Nickolyn said the fight between Thibodaux and defendant lasted only a few seconds before people started to jump in.  Nickolyn explained that at least ten people got on top of defendant while he was on the ground and punched him.  The next time Nickolyn saw defendant, defendant had pulled a gun out of his backpack and was running down the street.  On cross-examination, Nickolyn agreed it was possible that defendant was running away from danger as he had been jumped by ten people.  However, he did not recall seeing

8

anyone trying to fight or attack defendant when he pulled out the gun, and he did not see anyone else with a gun or weapon of any kind.

Jordyn Marie testified that she saw around ten people on top of defendant at the party. When Marie heard the gunshots, she ran to her car. Defendant got in her car and asked her to take him to a hotel in Gray. Marie testified that defendant seemed overwhelmed and unlike himself when he got in her car, and she testified he had injuries and blood on his face.

Hickox's roommate, Maitlynn Lerille, corroborated previous testimony that defendant slapped Thibodaux inside the house. According to Lerille, Thibodaux and his group of friends said they were going to leave the party after the first slap.[5] Five or ten minutes later, they walked back into the house after deciding not to leave. Lerille later saw Thibodaux and defendant exchanging words in the doorway and saw the second slap that escalated into the brawl. Lerille testified Thibodaux, who she said looked beaten up, left the fight and told Lerille to tell Hickox that he did not want to talk to her again. Lerille testified that defendant had not known about Hickox's relationship with Thibodaux and that she knew he would be upset when he found out.

Michael Guidry testified that after he broke up the initial fight between defendant and Thibodaux, defendant kept trying to fight Thibodaux. Eventually, Guidry, Thibodaux, and Badeaux started walking down the street to leave. They had walked about fifty yards when Guidry glanced backward and saw defendant approaching them quickly. Guidry saw defendant grab what he thought was a gun, and Guidry ran into the woods.

Defendant testified at trial, explaining that he was prescribed Trileptal for his "tripolar" disorder and Prozac for depression and anxiety.[6] According to defendant, tripolar disorder is a personality disorder that causes him to black out when he experiences extreme emotion. Defendant testified that he met Hickox about five or six months prior to the incident when they started working together, and he considered their relationship to be exclusive by the beginning of December 2020. Shortly before midnight

---

[5] Thibodaux's group of friends consisted of Cody Rodrigue, Dante Torres, Jhy Orgeron, Michael Guidry, Zachary Vega, and Terry Lee Griffin, all of whom testified at trial.

[6] There was no medical evidence introduced at trial regarding defendant's diagnoses or medications.

9

on December 31, 2020, defendant received a call from Hickox asking him to meet her at the New Year's Eve Party in Jolie Oaks. He testified that it was apparent upon arriving that he did not look like anyone else at the party and that he was mistaken as a drug dealer. While talking to some of his friends, he saw a guy (Thibodaux) walk up to Hickox, lean down, and whisper in her ear. He told Thibodaux that Hickox was with him, and Thibodaux looked at him and smiled. Defendant said that he continued talking to his friends, but he saw Thibodaux walk back up to Hickox and whisper in her ear again. According to defendant, it was clear Hickox did not want Thibodaux's attention. Feeling the need to intervene, defendant slapped Thibodaux, who again smiled. Defendant stated that he felt that Thibodaux was disrespecting both him and Hickox.

Later that night, defendant and Thibodaux met by the front door. Defendant claimed Thibodaux said, "I'm f***ing her too and [Hickox] think[s] she all that because she['s] f***ing with n******."[7] Defendant then slapped Thibodaux again, and the initial fight ensued. Two of Thibodaux's friends intervened, and the fight stopped. Defendant claimed that after the fight stopped, he was walking to get his hat and glasses, which had fallen off during the initial fight, when he was ambushed by two guys who started swinging at him. Multiple individuals jumped into the crowd to fight defendant, including Thibodaux. Defendant fell to the ground, and people punched him in the face, kicked him, and held his arms down. While on the ground, he heard someone say they were going to get their gun. Ten or twenty seconds later, defendant was able to get up and run to his bag. He testified that he got his weapon from his bag to protect himself and ran toward Marie's car, after which he blacked out and "that's when everything just happened." Defendant admitted that he threw the gun over a bridge at some point because he was scared.

On cross-examination, defendant acknowledged that he purposefully skipped a dosage of his medication on the day of the party and that his tripolar disorder made him experience anger more acutely than an average person. He also confirmed that he started a violent situation by slapping Thibodaux. Although he did not have a permit to

---

[7] The State recalled Zachary Vega, Thibodaux's stepbrother, as a rebuttal witness. Vega denied that Thibodaux used the "N" word at the party, and he said it would have been out of character for Thibodaux to say the "N" word.

10

carry a concealed firearm, defendant said he regularly carried a gun to protect others and himself. Defendant said that after watching the videos from that night, which were played for the jury, he learned that it was his cousin, Tai'Jean Carter, who said he was going to get a gun.

Ultimately, the jury found defendant guilty of second degree murder and attempted manslaughter. On appeal, defendant asserts that the evidence was insufficient to sustain his second degree murder conviction. Defendant does not deny that he shot and killed Thibodaux; rather, he contends the homicide was committed in self-defense. Defendant argues he acted with the force necessary to save him from danger as he was faced with the imminent danger of losing his life or receiving great bodily harm. In the alternative, he asserts the evidence presented at trial only supported a conviction for manslaughter, as he was provoked and shot Thibodaux in the heat of passion.

In finding defendant guilty of second degree murder, it is clear that the jury determined that the State proved beyond a reasonable doubt that the homicide was not committed in self-defense and concluded the use of deadly force against Thibodaux was neither reasonable nor necessary. Multiple witnesses, including defendant, testified that defendant initiated the physical altercation by slapping Thibodaux twice. While the initial altercation involved defendant and Thibodaux only, the fight thereafter escalated, and defendant was outnumbered. However, the testimonial and physical evidence showed that Thibodaux had walked about 150 to 170 feet toward the parked vehicles to leave when defendant ran after him and fired at least thirteen times from behind. Thibodaux was not trying to fight or attack defendant when he pulled out the gun. Based on our review of the evidence, we do not find that defendant could have reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm at the time he grabbed his gun and ran in pursuit of Thibodaux, who was unarmed. See **State v. Delco**, 2006-0504 (La.App. 1 Cir. 9/15/06), 943 So.2d 1143, 1150, writ denied, 2006-2636 (La. 8/15/07), 961 So.2d 1160.

Moreover, defendant's act of fleeing the scene after the shooting and failing to report it are inconsistent with a theory of self-defense. Flight following an offense reasonably raises the inference of a "guilty mind." **State v. Rosario-Colon**, 2019-0406

11

(La.App. 1 Cir. 9/27/19), 289 So.3d 126, 135, writ denied, 2019-01806 (La. 1/28/20), 291 So.3d 1055, cert. denied, ___ U.S. ___, 140 S.Ct. 2727, 206 L.Ed.2d 859 (2020). A rational juror could have reasonably concluded that the killing was not necessary to save defendant from the danger envisioned by LSA-R.S. 14:20(A)(1), that defendant was the aggressor in the conflict, and, as such, was not entitled to claim self-defense. See LSA-R.S. 14:21; **State v. Dunn**, 2021-0630 (La.App. 1 Cir. 12/22/21), 340 So.3d 77, 87, writ denied, 2022-00095 (La. 4/5/22), 335 So.3d 834.

The jury's verdict reflects that it also rejected defendant's claim that the shooting was committed in "sudden passion" and in "heat of blood" or that the shooting was a result of sufficient provocation. A reduction of second degree murder to manslaughter requires that the killing be "committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." LSA-R.S. 14:31(A)(1). The jury clearly found that defendant failed to meet his burden of proving the mitigating factors by a preponderance of the evidence. See **Dearmas**, 356 So.3d at 14; **Mellion**, 342 So.3d at 47-48. We find such determination was not irrational based on the evidence.

As discussed, the testimony at trial indicated that Thibodaux stopped fighting and retreated after his altercation with defendant. Several minutes later, defendant grabbed his gun, took off running, and started shooting at Thibodaux from behind as he was walking away. Defendant fired at least thirteen shots and disposed of his gun after fleeing the scene. Nothing in the moments leading up to the shooting established that defendant had been provoked by Thibodaux to the extent that a reasonable person in defendant's position would have lost his self-control. Even accepting defendant's assertion that Thibodaux used a racial slur, it is well-settled that mere words or gestures, however offensive or insulting, will not reduce a homicide from murder to manslaughter. See **Mellion**, 342 So.3d at 47. Nothing in the record suggests Thibodaux initiated the confrontation or provoked defendant. Rather, the evidence overwhelmingly showed that defendant was angered by Thibodaux's interest in Hickox, slapped Thibodaux twice before starting a brawl, and chased after Thibodaux before shooting him from behind.

12

Finally, defendant argues that because the jury found him guilty of the responsive verdict of attempted manslaughter of Badeaux, it erred in determining he was guilty of second degree murder of Thibodaux instead of the responsive verdict of manslaughter. Defendant contends the verdicts are inconsistent insomuch as the jury must have found the mitigating factors of sudden passion and heat of blood were present for the offense against Badeaux, but not present for the offense against Thibodaux. The State, in response, argues that the attempted manslaughter verdict was a compromise verdict which has no effect on the second degree murder conviction. We agree.

A jury has the prerogative to compromise and render a lesser verdict whenever it could have convicted as charged. **State ex rel. Elaire v. Blackburn**, 424 So.2d 246, 251 (La. 1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). A compromise verdict is a verdict which does not "fit" the evidence, but which the jurors deemed to be fair. **Id.** "Judicial tolerance of inconsistent verdicts rendered by a single jury has been a longstanding feature of the jury system." **State v. Quinn**, 2019-00647 (La. 9/9/20), 340 So.3d 829, 835 (per curiam), cert. denied, ___ U.S. ___, 141 S.Ct. 1406, 209 L.Ed.2d 139 (2021). Consistency in the verdict is not necessary. **Id.** Based on the jurisprudence, we find no merit to defendant's argument that the inconsistent verdicts require a reduction of his second degree murder conviction to manslaughter.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the trier of fact and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter. This assignment of error is without merit.

## PATENT ERROR

Pursuant to LSA-C.Cr.P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La.App. 1 Cir.

13

11/3/23), 378 So.3d 766, 775, <u>writ denied</u>, 2024-00027 (La. 5/21/24), ___ So.3d ___.

After a careful review of the record, we note one potential error.

The record reflects that defendant was not physically present when the trial court imposed his sentences, having been removed for disruptive behavior. Louisiana Code of Criminal Procedure article 835(A) provides that a defendant must be present when sentence is pronounced in felony cases. However, paragraph (B) of LSA-C.Cr.P. art. 835 allows the trial court, by local rule, to impose sentence via simultaneous audio-visual transmission in accordance with LSA-C.Cr.P. art. 562. That article provides, in pertinent part:

> In a case where the offense is a noncapital felony or a misdemeanor, the defendant, who is confined in a jail, prison, or other detention facility in Louisiana, may, with the court's consent and the consent of the district attorney, appear at ... sentencing by simultaneous audio-visual transmission if the court, by local rule, provides for the defendant's appearance in this manner and the defendant waives his right to be physically present at the proceeding.

LSA-C.Cr.P. art. 562(A). The transcript reflects that defendant was initially present in person for sentencing but was eventually removed during victim impact statements. Defendant had several outbursts involving expletives and asked numerous times that he be taken out of the courtroom. Thereafter, defendant was escorted to the parish jail for security purposes and was allowed to appear by audio-visual transmission with the consent of the State, trial court, and defense counsel. Because defendant repeatedly asked to be removed from the courtroom and made no subsequent objection to his removal, we find he waived his right to be physically present at the pronouncement of his sentences. Thus, we do not recognize a patent error by the trial court pronouncing the sentences in the absence of defendant's physical presence.

## CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of defendant, Kamron Kajon Jacquot.

**CONVICTIONS AND SENTENCES AFFIRMED.**

14